OLAVI DUNNE LLP
Daniel P. Hipskind, CA State Bar No. 266763
Dorian S. Berger, CA State Bar No. 264424
1880 Century Park East, Ste. 815
Los Angeles, California 90025
Telephone: 213-516-7900
Facsimile: 213-516-7910
Email: dhipskind@olavidunne.com
Email: dberger@olavidunne.com

OLAVI DUNNE LLP
Matt Olavi, CA State Bar No. 265945
Brian J. Dunne, CA State Bar No. 275689
816 Congress Ave., Ste. 1620
Austin, Texas 78701
Telephone: 512-717-4485
Facsimile: 512-717-4495
E-mail: molavi@olavidunne.com
E-mail: bdunne@olavidunne.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDMUND PIETZAK AND ERIN HUDSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION AND HelloWorld, Inc.,<br><br>Defendants | Case No. :_____<br><br>CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF PURSUANT TO 47 U.S.C. § 227, ET SEQ. (TELEPHONE CONSUMER PROTECTION ACT) AND VIOLATION OF THE UNFAIR BUSINESS PRACTICES ACT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Edmund Pietzak and Erin Hudson (collectively, "Plaintiffs"), through their attorneys, bring this action on behalf of themselves and all others similarly situated, make the following allegations on information and belief, except as to allegations pertaining to Plaintiffs individually, which are based on their respective personal knowledge.

## I.   __INTRODUCTION__

1.      In a relentless effort to advertise its products, Microsoft Corporation ("Microsoft") solicits mobile phone numbers from potential customers using deceptive postings on social media websites.  Once obtained, Microsoft automatically enrolls these phone numbers in a text message-advertising program that repeatedly transmits unsolicited advertisements for Microsoft products to mobile phones of potential customers.  Instead of obtaining *express written consent* prior to sending repeated text message solicitations, Microsoft lures potential customers to provide their mobile phone numbers in response to misleading sweepstakes and discount promotions.  Microsoft's deceptive postings on Facebook.com ("Facebook"), Twitter.com ("Twitter"), Instagram.com ("Instagram"), and YouTube.com ("YouTube") conceal from the public that providing their mobile phone number to Microsoft will subject individuals to a barrage of unsolicited "text" message advertisements.

2.      Despite the federal Telephone Consumer Protection Act's, 47 U.S.C. § 227 ("TCPA"), unequivocal prohibition, Microsoft's deceptive social media postings require customers to provide their phone number as a condition of eligibility for sweepstakes, discount promotions, and the purchase of certain products.  Microsoft's deceptive social media appeals include:

- "Text HALO to 29502 for a chance to win a limited edition Xbox One console."[1]

---

[1] *Microsoft Store Facebook Posting*, FACEBOOK.COM WEBSITE, June 14, 2015, https://www.facebook.com/MicrosoftStore/posts/10153347428817480.

- "Text SURPRISE to 29502 to find out how to win great prizes."[2]

- "[T]ext HAPPY to 29502 for a special surprise offer, now through December 23rd."[3]

- "[S]ave 5% on a future purchase by texting SOCIAL to 29502."[4]



Figure 1: *Microsoft Store Facebook.com Posting*, FACEBOOK.COM WEBSITE, May 6, 2015.

3.      Microsoft never discloses to potential customers that sending a text message to the phone number 29502 will automatically enroll potential customers' cellphones in an advertising program that spams a user's cellphone with up to ten advertisements a month.

4.      Microsoft solicits phone numbers from potential customers in an unlawful bait-and-switch marketing scheme. Customers are lured to provide their

---

[2] *Microsoft Store Facebook Posting*, FACEBOOK.COM WEBSITE, May 6, 2015, https://www.facebook.com/MicrosoftStore/posts/10153243843897480.

[3] *Microsoft Store YouTube.com Channel*, YOUTUBE.COM WEBSITE, December 5, 2014, https://www.youtube.com/watch?v=M_4nQ5BTn1w&feature=youtu.be.

[4] *Microsoft Store Twitter Posting*, TWITTER.COM WEBSITE, March 4, 2015, https://twitter.com/MicrosoftStore/status/573243653600243713.

OLAVI DUNNE LLP

OLAVI DUNNE LLP

phone number for a limited purpose (a chance to win a prize).  Yet, Microsoft enrolls these same customers in an undisclosed advertising program, transmitting multiple unconsented-to text message advertisements to customers' cell phones.

5.     Plaintiffs Mr. Pietzak and Ms. Hudson bring this suit to stop Microsoft and its marketing partner HelloWorld, Inc. ("HelloWorld") from utilizing unlawful Text Message Marketing to commercialize products and services.  Defendants use deceptive bait-and-switch techniques to send advertising solicitations to the mobile phones of the public.  Defendants constructed an unlawful text message-advertising program to circumvent and reach a public oversaturated with commercial messages.  Yet, the Federal Communications Commission reiterated that even self-styled "legitimate" businesses cannot be shielded from liability where they utilize unlawful text messaging programs.

> As its very name makes clear, the Telephone Consumer Protection Act is a broad "consumer protection" statute that addresses the telemarketing practices not just of bad actors attempting to perpetrate frauds, ***but also of "legitimate businesses" employing calling practices that consumers find objectionable***.

Declaratory Ruling and Order of the Federal Communications Commission, adopted June 18, 2015 ("FCC 15-72") at n.6 (emphasis added).

6.     In recent years, marketers stymied by federal laws limiting solicitation by telephone, facsimile machine, and email have increasingly looked to alternative technologies to send bulk solicitations to consumers, cheaply.[5]

7.     One of the newest methods of bulk marketing is to advertise through text messages sent to mobile phones.[6]

---

[5] *See* FCC 15-72 at n.6 ("As its very name makes clear, the Telephone Consumer Protection Act is a broad 'consumer protection' statute that addresses the telemarketing practices not just of bad actors attempting to perpetrate frauds, but also of 'legitimate businesses' employing calling practices that consumers find objectionable.").

[6] *See Id*. ("The TCPA makes it unlawful for any business—'legitimate' or not—to make robocalls that do not comply with the provisions of the statute.  While the Commission has traditionally sought to 'reasonably accommodate[] individuals' . . . we have not viewed 'legitimate' businesses as somehow exempt from the statute, nor do we do so today.").

8.      Unlike faxes and unanswered phone calls, a text message allows virtually instantaneous communication with the recipient, almost anywhere in the world, day or night.[7]  Many cellular phones immediately alert the recipient of new text messages.  Consumers frequently use text messaging to stay in close contact with business colleagues and associates, family members, and friends.  Text messaging is used by schools, police departments, fire departments, and emergency medical services across the country.

9.      Microsoft implemented its unlawful text messaging scheme in concert with HelloWorld, Inc. ("HelloWorld"), an advertising agency that trumpets its ability to "create unforgettable interactions."[8]  Microsoft and HelloWorld (collectively, "Defendants") extoll the use of text message advertising as a way to gain an advantage over competitors by marketing to an information-saturated audience.

> Hyper-fragmentation of media and high-cost, low response rates for direct mail and other traditional channels make mobile advertising a very attractive option for CPG brands.  Mobile is personal, immediate and uncluttered.

*Microsoft Advertising White Paper*, THE CONSUMER PACKAGED GOODS INDUSTRY'S GUIDE TO MOBILE ADVERTISING 7 (2011).

10.      Executives at HelloWorld describe text message advertising as a "surprise tactic," enabling Microsoft to effectively reach potential customers.  "***Sending your members*** a message on their birthdays is ***a surprise tactic*** that many brands use to build a relationship with their program members.  Take [Microsoft] Xbox, for example.  They recently took a new approach to wishing

---

[7] *See* FCC 15-72 at 57 ("[T]he Commission in 2003 determined that the TCPA applies to SMS texts.367 Thus, we find no uncertainty on this issue.").

[8] *HelloWorld – What We Do*, HELLOWORLD WEBSITE (2015), http://www.helloworld.com/what-we-do/ (HelloWorld, formerly d/b/a ePrize, Inc.).

OLAVI DUNNE LLP

their loyal members happy birthday."[9]

11.     Defendants' phone number harvesting and commercial text messaging scheme violates Federal Law.  The TCPA requires corporations, such as Microsoft and HelloWorld, to obtain *express written consent* from a mobile phone user before sending text messages advertising services and/or products.  *In re Rules and Reg's Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1839, 1856-67 (Feb. 15, 2012) ("2012 TCPA Order") at § 18.  Driven by concern about advertising using automated text messages, the Federal Communications Commission ("FCC") requires, prior to sending any automated text messages to a consumer, that a company must provide a "clear and conspicuous disclosure"[10] of the terms of the consent:

> [I]nforming the person signing that: (A) By executing the agreement, *such person authorizes* the seller to deliver or cause to be delivered to the signatory telemarketing calls using *an automatic telephone dialing system* or an artificial or prerecorded voice; and (B) *The person is not required* to sign the agreement (directly or indirectly), or agree to enter into such an agreement *as a condition of purchasing any property, goods, or services*.

47 C.F.R. § 64.1200(f)(8)(i) (emphasis added).

12.     FCC Commissioner Mignon Clyburn stated in a June 18, 2015, hearing relating to the TCPA that the purpose behind requiring "express written consent" prior to sending commercial text messages was simple: protecting consumers from surprises.  "*It's simple*: consumers should be able to make the decision about whether they receive automated calls.  If they want them, they can consent.  And *if they don't consent, they should be left alone.*"[11]

---

[9] Michela Baxter, *4 Ways to Add Surprise to Your Loyalty Programs*, HELLOWORLD BLOG, July 9, 2014, http://www.helloworld.com/insights/blog/ (emphasis added).

[10] "The term clear and conspicuous means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures."  47 C.F.R. § 64.1200(f)(3) (emphasis in original.).

[11] Mignon Clyburn, FCC Commissioner, *Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG

OLAVI DUNNE LLP

13.     Microsoft's unlawful text messaging practices violate industry guidelines and standards that Microsoft and HelloWorld advocate themselves. Microsoft[12] and the vendor it uses to assist with mobile marketing, HelloWorld,[13] are "Premier Members" of the Mobile Marketing Association ("MMA").[14]  The MMA is a non-profit trade association of companies involved in advertising directed to mobile devices such as cellular phones.  The MMA develops guidelines and best practices for mobile marketing programs, including text-message advertisements.  MMA guidelines for text message advertising are unequivocal - a company must not automatically enroll customers in automatic text message marketing programs based on customers' provision of a mobile phone number to a company.

> This opt-in applies only to the specific program a subscriber is subscribed to and **should not be used as a blanket approval to promote other programs, products, and services**. However, after the subscriber has been given the complete details about the opt-in scope, the subscriber may opt-in to receive other messages.

*U.S. Consumer Best Practices for Messaging* V7.0 § 1.4-10, MOBILE MARKETING ASSOCIATION (October 16, 2012) (emphasis added).

14.     Microsoft's solicitation of mobile phone numbers in conjunction with eligibility to claim a prize and/or discount does not entitle Microsoft to simultaneously enroll ("opt in") the same phone number to receive repeated text message advertisements.  The use of an automatic opt-in to send advertisements via text message is unlawful under the TCPA and violates the MMA's guidelines

---

Docket No. 02-278, WC Docket No. 07-135 (emphasis added).

[12] Microsoft serves on the MMA Privacy Committee, Location Committee and Native Advertising Committee.

[13] HelloWorld serves on MMA policymaking committees including: Privacy, Location, Mobile Coupons and Text Marketing.

[14] *Mobile Marketing Association Announces Premier Membership Tier*, MOBILE MARKETING ASSOCIATION NEWS (November 16, 2009), http://www.mmaglobal.com/news/mobile-marketing-association-announces-premium-membership-tier ("Microsoft is a perfect example of the type of industry leadership and commitment that Premier Memberships were created to acknowledge and expand.").

OLAVI DUNNE LLP

regarding text message advertisements.

15.   Microsoft agreed to the MMA's guidelines and repeatedly urges companies to follow the MMA guidelines.

> ***Adopt the Mobile Marketing Association's guidelines***. . . . The MMA's guidelines help marketers and CPG companies support the rights and privacy of consumers, stay compliant with industry best practices and regulations and get the most out of the practice of mobile advertising.

*Microsoft Advertising White Paper*, THE CONSUMER PACKAGED GOODS INDUSTRY'S GUIDE TO MOBILE ADVERTISING 11 (2011).

16.   Defendants designed the transmission of unsolicited advertising messages to potential customers to drive Microsoft product sales.  Eric Lazar, HelloWorld's VP of Mobile Business Development, in a 2014 presentation stated that advertising products using text messages was one of the most effective strategies for targeting potential customers: "texting is still the activity most engaged with on a mobile device means ***SMS marketing is a vital component*** of a well-executed marketing plan."[15]

17.   Microsoft white papers extoll the efficacy of text message advertisements.  "Text messaging – SMS is an effective channel for the CPG [consumer packaged goods] sector because consumers exchanged more than 5 billion text messages per day."[16]  However, Microsoft's own researchers recognize the danger of SMS spamming despite Microsoft's own spam text advertising programs.

---

[15] Microsoft's unlawful SMS solicitation program was co-managed with HelloWorld, Inc. SMS is an abbreviation for "Short Message Service" and refers to the standardized communications protocols that are used to enable sending text messages between mobile phones.  The term SMS is also used broadly to refer to "text messages."  The referenced Webinar on the advantages of sending SMS messages to potential customers was presented by Eric Lazar, HelloWorld's VP of Mobile Business Development.  *SMS Is the Perfect Conduit*, HELLOWORLD WEBINAR, January 22, 2014, http://www.helloworld.com/insights/webinars/sms-is-the-perfect-conduit/ (emphasis added).

[16] *Microsoft Advertising White Paper*, THE CONSUMER PACKAGED GOODS INDUSTRY'S GUIDE TO MOBILE ADVERTISING 7 (2011).

OLAVI DUNNE LLP

Attackers can manipulate smart-phone zombies to send junk or marketing messages through SMS. In the case that the charging model is flat, a compromised smart-phone can spam for "free;" and therefore its owner may not even notice its bad behavior. *Free SMS spamming gives attackers good incentives to compromise smart-phones*.

Chuanxiong Guo, Helen J. Wang & Wenwu Zhu, *Smart-Phone Attacks and Defenses,* in HotNets III (2004) (emphasis added).[17]

18.      Unlike other forms of advertising, text messages such as those sent here cost the recipients money, because cellular phone users must frequently pay their wireless service providers either for each text message they receive or incur a usage allocation deduction to their text-messaging plan, regardless of whether or not the message is authorized.

19.      Defendants' use of social media websites such as Twitter and Facebook to solicit the mobile phone numbers of potential customers was calculated to maximize the efficacy of Defendants' marketing schemes. However, using social media to solicit mobile phone numbers does not absolve Defendants from liability when, as here, Defendants solicited mobile phone numbers without providing any notice that such numbers would be subject to commercial "autodialer" text messages and that potential customers did not have to provide their mobile phone number as a condition to make a purchase, receive a discount or enroll in a contest. The FCC has been cognizant that companies' social media postings and in-store displays might be limited in their ability to provide disclosures to potential customers – limited screen space. However, the FCC, as recently as July 18, 2015, reiterated that companies must (at a minimum) alert the public that sending a text message would lead to receiving "*marketing text messages generated by an automated dialer*" and that sending a text was *not*

_____

[17] Mr. Guo and Ms. Wang were employed by Microsoft Research at the time the paper was written.

"*required* to make a purchase."[18]

20.     Over the course of an extended period beginning on or about October 2013, Microsoft and/or its agents directed the mass transmission of text messages to cellular phones nationwide in an attempt to reach customers or potential customers of Microsoft's products.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  This Court has personal jurisdiction over Defendants because (a) a substantial portion of the wrongdoing alleged in this complaint took place in this State, and (b) Defendants are authorized to do business here, have sufficient minimum contacts with this State, and/or otherwise intentionally avail themselves of the markets in this State through the promotion, marketing, and sale of products and services in this State, and (c) to render the exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice.  Under the Class Action Fairness Act of 2005, this Court has jurisdiction as the amount of damages sustained by the Class exceeds five million dollars.

22.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) (1)-(2) because Defendants have a significant presence in the jurisdiction and Microsoft has significant presence in the Central District of California.  Microsoft maintains thirteen retail stores in California[19] and sales offices throughout California including Irvine and Los Angeles.[20]  HelloWorld has an office in Los Angeles,

---

[18] FCC 15-72 at n.363.

[19] *Microsoft Store Locations*, MICROSOFT.COM WEBSITE (last visited July 10, 2015), https://www.microsoft.com/en-us/store/locations/.

[20] *Microsoft Southern California District Offices*, MICROSOFT.COM WEBSITE (last visited July 10, 2015), https://www.microsoft.com/about/companyinformation/usaoffices/southerncalifor

OLAVI DUNNE LLP

California[21] and HelloWorld employees that work on digital marketing campaigns for Microsoft are located in the state of California.[22]  Venue is also proper under California Code of Civil Procedure § 17203 as this Court is a Court of competent jurisdiction.

## III.    PARTIES

23.    Plaintiffs filed this case to stop Defendants' practice of sending repeated text messages advertising products to phone numbers harvested from potential customers in response to social media postings.  Under Federal law, it is unlawful for any person to make any call (other than a call made for emergency purposes or made with the prior express written consent of the called party) using any automatic telephone dialing system to any cellular telephone number.

### Edmund Pietzak

24.    Plaintiff Edmund Pietzak is a United States citizen and resident of Los Angeles County in the State of California.  Edmund Pietzak is an experienced Account Manager at a literary and talent agency in Los Angeles, California.  Mr. Pietzak's literary and talent agency manages the literary work of clients including Kirk Douglas, Goldie Hawn, Lauren Bacall, Rita Rudner, and the estate of Elia Kazan, among others.  Mr. Pietzak relies on his mobile phone to manage client schedules, contractual deadlines, promotions, and appearances.  Further, Mr.

nia/default.aspx.

[21] *HelloWorld Locations*, HELLOWORLD WEBSITE (last visited July 10, 2015), http://www.helloworld.com/company/locations#los-angeles (identifying HelloWorld's office located at 450 South Bixel Street, Los Angeles, CA 90017).

[22] *LinkedIn Profile of Anne Kennedy* (Vice President, Business Development at HelloWorld, San Francisco Bay Area, LINKEDIN WEBSITE (last visited July 10, 2015) ("As a Business Development Leader in the West Market, I am responsible for driving new business with Tier 1 accounts from Seattle to San Diego.  I also manage an incredible sales team, and together we support new sales and relationships with clients like Microsoft. . .").

OLAVI DUNNE LLP

Pietzak manages numerous employees and oversees the daily operations of his firm. Previously, Mr. Pietzak worked at Abrams Artists Agency and New Line Cinema. Defendants, on one or more occasions during the class period, sent unauthorized commercial text messages to Mr. Pietzak's mobile phone without his authorization. Moreover, without Mr. Pietzak's consent, Defendants enrolled Mr. Pietzak in an automated text message program that repeatedly advertised Microsoft products using automated text messages. These commercial text messages requested that Mr. Pietzak purchase various Microsoft products. Mr. Pietzak never provided express written consent to have automated commercial text messages sent to his mobile phone.

25.    Mr. Pietzak viewed Defendants' social media message shown at Figure 8. Mr. Pietzak never believed, following his review of the disclosures shown on Figure 8, that he would automatically be enrolled in Microsoft's automated text-message marketing program. Mr. Pietzak, at the time he sent a text message with the language "GAMER," did not understand (or consent) that he was providing Microsoft with permission to enroll him in its automatic text-messaging program. Further, Mr. Pietzak did not and would not have provided his consent to enroll in Defendants' automatic text-messaging advertising program. Further, Mr. Pietzak never provided his consent to be enrolled in Defendants' automatic text messaging program as there was no disclosure that Defendants would be sending commercial messages to his mobile phone using an "automatic telephone dialing system" ("autodialer"). Mr. Pietzak believed that to be eligible to receive the offer provided in the social media posting his consent and/or provision of his mobile phone number was a condition. Mr. Pietzak understood following his review of the social media positing that he had to send a text message as a condition to purchase.

26.    During the class period, Mr. Pietzak continuously received multiple

OLAVI DUNNE LLP

unsolicited SMS or "text" messages on his cellular phone from Defendants and/or their agents. Mr. Pietzak reviewed the statements that Defendants made in its social media account postings. The posting that Mr. Pietzak reviewed and relied on included the screen shown below at Figure 8. Mr. Pietzak was and continues to be concerned about his privacy, including who sends text messages to him on his cellular phone and did not want to be repeatedly "messaged" by Microsoft. Further, Mr. Pietzak is an executive in the entertainment industry whose time has substantial value. The intrusion of receiving unconsented to text messages on his mobile phone has caused him significant distress and embarrassment. Some of the incidents in which Mr. Pietzak has experienced embarrassment and emotional harm include the unwanted ringing of his phone in response to messages he received based on Microsoft's text messaging. The unwanted ringing of his mobile device has caused Mr. Pietzak actual harm and embarrassment in his profession.

27. Based on Microsoft's social media accounts, Mr. Pietzak did not believe that Defendants would send repeated messages to his mobile phone advertising Microsoft products. Mr. Pietzak understood, based on Defendants' postings on Microsoft's social media accounts that, to be eligible for promotions and/or sweepstakes, he had to send a message to the number shown in Microsoft's social media postings. Mr. Pietzak had no idea that Defendants would, based on his sending of a text message to "29502," enroll Mr. Pietzak to receive up to ten commercial text messages per month advertising Microsoft products.

28. Having now reviewed Defendants' other social media postings shown at Figures 9, 10, 11, 13, 14, 16, & 17, Mr. Pietzak had no idea that Defendants would automatically enroll a person such as himself in Microsoft's automated text messaging program. Based on the statements made on Microsoft's social media accounts, Mr. Pietzak believed that Defendants were only requesting

OLAVI DUNNE LLP

1  consent to enroll Mr. Pietzak for a promotion and/or sweepstakes and would not

2  enroll Mr. Pietzak in an automated text messaging advertising program.

### Erin Hudson

3

4  29.     Plaintiff Erin Hudson is a United States citizen and resident of Los

5  Angeles County in the State of California.  Ms. Hudson is a partner at Penchant

6  Entertainment and former Vice-President at Morgan Creek Productions in Los

7  Angeles, California.  Ms. Hudson was a co-producer of motion pictures including

8  the Hoax, associate producer of Winter Passing, and was a production executive

9  on the Hostage, Prime, and the Matador.  Ms. Hudson relies on her mobile phone

10 to manage her professional work. Defendants, on one or more of occasions during

11 the class period, sent unauthorized commercial text messages to Ms. Hudson's

12 mobile phone without her authorization.  Moreover, without Ms. Hudson's

13 express written consent, Defendants enrolled Ms. Hudson in an automated text

14 message program that repeatedly advertised Microsoft products using automated

15 text messages.  These commercial text messages requested that Ms. Hudson

16 purchase various Microsoft products.  Ms. Hudson never provided express written

17 consent to have automated commercial text messages sent to her mobile phone.

18 30.     Ms. Hudson viewed Defendants' social media message shown at

19 Figure 13.  Ms. Hudson never contemplated, following her review of the

20 disclosures shown on Figure 13, that Defendants would automatically enroll her in

21 Microsoft's automated text-message marketing program.  Ms. Hudson, at the time

22 she sent a text with the language "SURPRISE," did not understand (or consent)

23 that she was providing Microsoft with permission to enroll her in an automatic

24 text-messaging program.  Further, Ms. Hudson did not and would not have

25 provided her consent to enroll in Defendants' automatic text-messaging

26 advertising program.  Further, Ms. Hudson never provided her consent to be

27 enrolled in Defendants' automatic text messaging program as there was no

28

OLAVI DUNNE LLP

disclosure that Defendants would be sending commercial messages to her mobile phone using an "automatic telephone dialing system" ("autodialer"). Ms. Hudson believed that to be eligible to receive the offer provided in the social media posting, her consent and/or provision of her mobile phone number was a condition. Ms. Hudson understood following her review of the social media positing that she had to send a text message as a condition to be eligible for the promotion.

31.     Microsoft's repeated sending of spam text message advertisements to her mobile device has caused Ms. Hudson repeated embarrassment, financial loss, and emotional injury. In meetings with movie producers and other potential clients, Ms. Hudson's mobile phone rang at inappropriate times in response to Microsoft's unconsented to and unwanted text message advertisements. Defendants' unconsented to advertisements have caused Ms. Hudson embarrassment, lost profits, and actual damages to her reputation. The interruption of business meetings from the unique ring of an incoming text message caused Ms. Hudson concern as it telegraphs to potential and current clients "I decided I only wanted to hear my half of the conversation."[23]

32.     During the class period, Ms. Hudson has continuously received multiple unsolicited SMS or "text" messages on her cellular phone from Defendants and/or its agents. Ms. Hudson reviewed the statements that Defendants made in their social media account postings.

33.     Ms. Hudson is concerned about her privacy, and following Defendants' intrusion on her mobile device, Ms. Hudson sought to understand the legal basis that could provide a large corporation with the ability to send commercial text messages to her mobile phone. Following her review of

_____

[23] *Jerry Seinfeld*, THE TONIGHT SHOW STARRING JIMMY FALON  2:35-55 (Feb. 19, 2015), https://www.youtube.com/watch?v=xR1ckgXN8G0 (Jerry Seinfeld's commentary on the use of text messaging.)

OLAVI DUNNE LLP

Defendants' misleading statements made in an effort to solicit mobile numbers from the public, Ms. Hudson became increasingly concerned Defendants were deploying a bait-and-switch solicitation scheme designed to gain access to the mobile phone numbers of the public.

34.   Ms. Hudson, alarmed at Defendants' activities, reviewed the screens shown below at Figures 10, 11, 16, 17 and 18. Ms. Hudson was and continues to be concerned about the privacy of her cellular phone. Ms. Hudson did not want to be repeatedly "messaged" by Microsoft. Based on Microsoft's social media accounts, Ms. Hudson did not believe Defendants would send repeated messages to her mobile phone advertising Microsoft products. Ms. Hudson understood, based on Defendants' postings on Microsoft's social media accounts that she had to send a text message to the number "29502" with a text message. Ms. Hudson understood that, to be eligible for promotions and/or sweepstakes, she had to send a message to the number shown in Microsoft's social media postings. Ms. Hudson had no idea that Defendants would, based on her sending a text message to "29502," enroll Ms. Hudson to receive up to ten commercial text messages per month advertising Microsoft products.

35.   Having now reviewed Defendants' other social media postings shown at Figures 10, 11, 16, 17 and 18, Ms. Hudson had no idea that Defendants would automatically enroll a person such as herself in Microsoft's automated text messaging program. Based on the statements made on Microsoft's social media accounts, Ms. Hudson believed Defendants were only requesting consent to enroll Ms. Hudson for a promotion and/or sweepstakes and would not enroll Ms. Hudson in an automated text messaging advertising program.

**Microsoft**

36.   Defendant Microsoft Corporation is a Washington corporation who, at all relevant times, maintained retail stores and corporate offices in this Judicial

OLAVI DUNNE LLP

District.  Microsoft is a global software and consumer electronics company that sells both software and hardware, including its Microsoft Xbox video game system to consumers throughout the United States, including in this Judicial District.



(1) *John Callaham*, MICROSOFT PUT ITS NAME ON THE OLD NOKIA THEATER IN LOS ANGELES, June 9, 2015, http://www.windowscentral.com/microsoft-theater-los-angeles-new-name-former-nokia-theater; (2) *Michael Archambault*, FIRST MICROSOFT STORE WITHIN BEST BUY TO OPEN TOMORROW IN LOS ANGELES, August 6, 2013, http://www.windowscentral.com/first-microsoft-store-within-best-buy-open-tomorrow-los-angeles; (3) *Microsoft Century City Office*, MICROSOFT RETAIL, July 10, 2015, https://www.microsoft.com/en-us/store/; (4) *Jacquelyn Ryan*, MICROSOFT EXPANDING ON WESTSIDE, February 8, 2013, http://www.labusinessjournal.com/news/.

## **HelloWorld**

37.     Defendant HelloWorld, Inc. is an advertising company based in Michigan with offices throughout the United States including offices in Phoenix, Arizona and Los Angeles, California.  HelloWorld works at the instruction and direction of its clients, including Microsoft.  For example, Microsoft has repeatedly directed and controlled HelloWorld's promotions, including the unlawful activities outlined above.  HelloWorld marketing materials champion the implementation of the text marketing promotions it runs under the direction of Microsoft and for Microsoft's benefit.

OLAVI DUNNE LLP

**Microsoft Stores**
**Driving engagement and sales**

**PRODUCT AWARENESS**
Microsoft Stores is your go-to location for technology and technology services – from phones, tablets, and software for work to video games and consoles for play. To promote their breadth of offerings and highlight specific products, they built a mobile subscriber database and deliver MMS images of products and promotions.

**"12 DAYS OF DEALS"**
During the holiday season, Microsoft Stores delivered daily mobile messages and leveraged MMS to drive holiday sales and engagement. MMS messages increased CTR for the retailer over traditional SMS.

Figure 2: *Amazing MMS Mobile Marketing Campaigns*, HELLOWORLD EBOOK (2015).

38.  Microsoft maintains direct control over its vendors, including HelloWorld.  Specifically, Microsoft controls and directs vendors such as HelloWorld's text messaging programs.  Microsoft, when working with vendors, requires that if a vendor "intends to use a subcontractor to help collect use, distribute, access, or store Microsoft Personal Information," the vendor must "obtain Microsoft's express written consent prior to subcontracting services."[24] Thus, the SMS Messaging and Social Media Posts that are identified in the complaint and which give rise to the claims of the Plaintiffs and Class were implemented by Microsoft directly and through its direct control of HelloWorld.

39.  Defendants' practice of automatically enrolling users in its SMS advertising scheme is contrary to the law and violates Microsoft's own privacy policies, which require:

> **Collection** of personal information from individuals only for the purposes identified in the privacy notice we provided
> **Choice and consent** for individuals regarding how we collect, use, and disclose their personal information
> **Use and retention** of personal information in accordance with the privacy notice and consent that individuals have provided

---

[24] Microsoft Vendor Data Protection Requirements 6 (September 2006),

OLAVI DUNNE LLP

**Monitoring and enforcement** of compliance with our privacy policies, both internally and with our vendors and partners, along with established processes to address inquiries, complaints, and disputes

MICROSOFT PRIVACY PRINCIPALS (2015).

## IV.   THE TELEPHONE CONSUMER PROTECTION ACT

40.    Plaintiffs bring this action against Defendants for themselves and others similarly situated to stop Defendants' practice of sending unsolicited text messages to cellular telephones.  Plaintiffs seek damages and other available legal or equitable remedies on behalf of all persons injured by Microsoft's illegal actions which invaded peoples' privacy in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA" or "47 U.S.C. § 227").

41.    One of the newest types of bulk marketing is to advertise through Short Message Services.  The term "Short Message Service" or "SMS" is a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 characters.

42.    An "SMS message" is a text message call directed to a cellular telephone with the assigned telephone number.  The recipient's cell phone rings, when an SMS message call is made, alerting the owner of the phone that a message is received.

43.    The annoyance and intrusion of being automatically enrolled in repeated SMS text messaging has been observed by Jeff Marcoux, Central Marketing Organization Lead for Worldwide Enterprise Marketing at Microsoft. "Phones are really personal ….  So how do you deliver things in context of me interacting with my phone?  It's not simply pushing ads."[25]

44.    HelloWorld has recognized the value of directing marketing content

---

[25] *Dynamite Mobile Marketing Boils Down To Two Magic Words: Context And Value*, MICROSOFT FOR WORK BLOG, May 11, 2015, http://blogs.microsoft.com/work/2015/05/11/dynamite-mobile-marketing-boils-down-to-two-magic-words-context-and-value/.

Olavi Dunne LLP

to potential customers' mobile phones.



Figure 3: *ERIC LAZAR, VP MOBILE BUSINESS DEVELOPMENT AT HELLOWORLD*, SMS IS THE PERFECT CONDUIT, January 22, 2014, YoutTube Video. available at: https://www.youtube.com/watch?v=UP-3_X9NLfU

45.     In addition, Microsoft engaged with HelloWorld for its ability to create so-called "call-to-action" programs that utilized SMS messaging to reach potential customers.

> ***Keep your program calls-to-action clear and simple***.  Remember that simplicity works.  Consumers should not have to think about what it is the marketer wants them to do.  The call-to-action should be clear and easily understood.  ***Think past the click***.  Once consumers respond to your advertisement, what next?  Will they receive a message, be taken to a mobile website, or invited to download an application?  Consider the complete 360-degree experience and make sure the total experience is consistent and on point with campaign objectives and message.

*Microsoft Advertising White Paper*, The Consumer Packaged Goods Industry's Guide to Mobile Advertising 11 (2011).

### A. Objective Of The TCPA

46.     Skirting the law to send a barrage of commercial text messages has been an effective way to gain an advantage over competitors in an increasingly competitive marketplace.  Yet, these activities are illegal and the use of so-called "SMS marketing campaigns" has an enormous problem to the public who rely on their phones for communicating and transacting business.

OLAVI DUNNE LLP

[C]allers cannot skirt their obligation to get a consumer's consent based on changes to their calling equipment or merely by calling from a list of numbers.  We make it clear that it should be easy for consumers to say "no more" even when they've given their consent in the past.

Statement of Tom Wheeler, Chairman of the FCC, *Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135.

It's simple: consumers should be able to make the decision about whether they receive automated calls.  If they want them, they can consent.  And if they don't consent, they should be left alone.

Mignon Clyburn, FCC Commissioner, *Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135.

Complaints under the Telephone Consumer Protection Act (TCPA), the law that makes unwanted robocalls and texts illegal, are together the largest complaint category we have at the Commission.  Last year alone, we received more than 215,000 such complaints.  The data reveal the scale of the robocall problem.  The individual stories behind them reveal the costs.

Statement of Tom Wheeler, FCC Chairperson, *Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135.

47.    The illegal text message-marketing program (outlined in this complaint) violates industry guidelines that the Defendants themselves have authored and promulgated.

The updated regulations state that anybody who is using an automated dialing system to call a US number – landline or mobile – must have expressed, opted---in permission from the person to whom the marketing offer is being extended. Failure to adhere to the rules carries significant penalties.

*Marketer's Guide to Messaging: Trends and Best Practices* at 3, MOBILE MARKETING ASSOCIATION (2014) (Bob Girolamo of HelloWorld was a member of the MMA Marketing Best Practices for Messaging Task Force that developed this guide).

Independent of method of entry (SMS, MMS, Web, WAP, IVR) opt-in and opt-out records - including single, double and triple opt-in records – should be retained from the time the subscriber opts-in until a minimum of six months after the subscriber has opted-out of the program (minimum opt-in archiving period is one calendar year).

*U.S. Consumer Best Practices for Messaging* V7.0 § 1.8-2, MOBILE MARKETING ASSOCIATION (October 16, 2012).

OLAVI DUNNE LLP

The content provider is responsible for tracking program opt-in information by subscriber.

*U.S. Consumer Best Practices for Messaging* V7.0 § 1.8-3, MOBILE MARKETING ASSOCIATION (October 16, 2012).

All sweepstakes must offer a free Alternative Method Of Entry (AMOE). Allowing participants to enter via mail, internet, fax, or IVR via a toll free number are all forms of AMOE, but are not the only forms of free AMOE.

*U.S. Consumer Best Practices for Messaging* V7.0 § 1.11-2, MOBILE MARKETING ASSOCIATION (October 16, 2012).

48.     The Mobile Marketing Association provides best practices endorsed by Microsoft and HelloWorld.  Microsoft has repeatedly urged others to follow industry guidelines such as the Mobile Marketing Association's guidelines.

***Adopt the Mobile Marketing Association's guidelines***.  The Mobile Marketing Association (http://www.mmaglobal.com) is an industry-leading global trade association focused on helping marketers and CPG companies effectively engage consumers with mobile marketing and advertising practices.

*Microsoft Advertising White Paper*, The Consumer Packaged Goods Industry's Guide to Mobile Advertising 11 (2011) (emphasis added).

49.     Even before the FCC adopted stricter rules requiring express prior written authorization before sending SMS marketing messages, HelloWorld executives identified that those involved in sending marketing messages to mobile phones needed to follow the Mobile Marketing Association Guidelines.

OLAVI DUNNE LLP



FIGURE 4: RUNNING SWEEPSTAKES, CONTESTS AND USER GENERATED CONTENT PROMOTIONS ON THE LATEST SOCIAL AND MOBILE MARKETING PLATFORMS, Slide 13 (Melissa Landau Steinman, Partner, Venable, LLP Gabe Karp, General Counsel, ePrize, Inc. Mary Kay Andersen, LCA Promotions Manager, Microsoft Corp.  November 28, 2012.).

### 1) Standards in The Industry Illustrate - Microsoft and HelloWorld's Unusual and Illegal Practices

50.    Microsoft and HelloWorld provided advice to numerous companies regarding compliance with the TCPA.  Despite providing this advice, Defendants' own actions here violate the TCPA.

51.    Microsoft, in other promotions, provided clear disclosures of what it is doing.  This illustrates the deficient actions of the unlawful activities covered by this complaint.



Figure 5: *Microsoft Store Sweepstakes*, MICROSOFT ePRIZE WEBSITE, https://microsoftstore.promo.eprize.com/mobile/ (June 2015).

      52.     Even Microsoft's own vendor, HelloWorld, discloses that its messages are sent from an automated system and that a subscriber will receive up to 8 marketing/promotional SMS messages a month.

Figure 6: *Terms and Conditions*, HELLOWORLD WEBSITE, January 17, 2014, https://www.helloworld.com/terms (the full terms and conditions regarding HelloWorld's mobile marketing is over six pages).

## V.    ADDITIONAL FACTUAL ALLEGATIONS

      53.     Defendants fail to obtain express written consent from the owners

OLAVI DUNNE LLP

of mobile phones to send automated text message advertisements.  Defendants fail to inform potential customers that Defendants will send repeated text message advertisements to customers' mobile phones.

54.     Defendants never disclosed an automated telephone dialing system was used to deliver the text messages.[26]

55.     Defendants fail to notify potential customers that they are not required to sign up for marketing text messages to purchase a product.

56.     Defendants fail to satisfy their obligation of providing "clear and conspicuous disclosure" detailing the consequences of providing the requested consent.  Indeed, Defendants' social media ads provide no disclosure, let alone a clear and conspicuous disclosure.  The postings fail to clearly inform prospective consumers that the provision of a phone number to Defendants' short code will result in numerous promotional "text ads" being sent to the consumers' cell phone number each month.

57.     Defendants fail to receive an unambiguous agreement to receive autodialed telemarketing calls at a designated telephone number.  Again, the Defendants' social media postings do not indicate that the text messages will be sent using an automated telephone dialing system.  Defendants fail to state that the consumer's act of providing a number is a manifestation of both his or her signature, and consent to be bound to any terms or conditions.

58.     Defendants fail to disclose to Plaintiffs and prospective class members that their consent to receiving text message advertising is not a condition for purchase and/or receipt of a promotion.  There is no question that this requirement is not met as none of the social media postings explicitly contains any language to the following effect: "consent to these terms is not a condition of purchase."

---

[26] *See* FCC 15-72 ("Text messages are 'calls' subject to the TCPA, as previously determined by the Commission.").

OLAVI DUNNE LLP

OLAVI DUNNE LLP

59.     On information and belief, Defendants engaged in nearly identical campaigns, requesting users to send text messages with the following keywords to 29502: "GAMER," "HAPPY," "SURPRISE," "SOCIAL," "PLAY," "WALDEN," "EVENTS," "MSHS."

60.     Defendants' social media solicitation messages, which solicit consumers' cellular phone numbers, mislead consumers by suggesting that, by "text[ing]" a keyword (*e.g.*, "GAMER" or "SOCIAL") to an SMS short code (*e.g.*, 29502) owned by Defendants or Defendants' agents, consumers will be able to obtain information and discounts unavailable to those who do not send such "text messages."

61.     Defendants or Defendants' agents own and operate the SMS short code 29502.

62.     Defendants keep and indefinitely store the cellular telephone numbers of each consumer that sends a "text message" to SMS short code 29502, which is operated by Defendants or Defendants' agents.

63.     Defendants do not provide to a reasonable consumer clear and conspicuous notice that, by sending a text message to Defendants' SMS short code, consumers will receive autodialed marketing messages from Defendants marketing Microsoft's products and services.

64.     Microsoft and HelloWorld, in violation of the TCPA, have undertaken marketing activities that are aimed at soliciting the mobile phone numbers of the public with intentionally unclear disclosures. They use bait and switch marketing tactics. Their promotions lure the unsuspecting public into providing their mobile phone number to Microsoft to later have their cellular phones automatically enrolled in a text message spam program. All these activities by Microsoft and HelloWorld violate the TCPA and Defendants' own privacy policies.

OLAVI DUNNE LLP

65.     Each such text message call uses equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.  By using such equipment, Defendants were able to send thousands of text messages simultaneously to lists of thousands of cellular phone numbers of consumers without human intervention.  These text messages were sent en masse through the use of a short code and without the prior express consent of Plaintiffs and the other members of the Class to receive such text messages.

66.     The conduct driving this case is the allegation that the defendants made harassing, repeated, and intrusive autodialed and/or prerecorded calls or texts to consumers' cell phones without prior express consent to do so.

**A. Twitter Disclosures**

67.     Over the course of an extended period, beginning at least in 2014, Defendants engaged in marketing efforts designed to deceive potential consumers into providing Defendants with consumers' cellular phone numbers without disclosing that Defendants intended to send these cellular phone numbers a barrage of SMS messages marketing Microsoft products and services.

- @Xbox Twitter Account Was started in March 2009 and currently has 5.57 Million followers as of June 16, 2015.[27]

- @Microsoft Twitter Account was started September 2009 and has 6.64 Million followers.[28]

- @MicrosoftStore Twitter Account was started in September 2008 and has 806,000 followers as of June 16, 2015.

---

[27] *See* @XBOX TWITTER ACCOUNT, https://twitter.com/Xbox (last visited June 16, 2015).

[28] *See* @MICROSOFT TWITTER ACCOUNT, https://twitter.com/microsoft (last visited June 16, 2015).



Figure 7: *Holly Richmond*, THE GROWTH OF MOBILE MARKETING AND TAGGING, MICROSOFT TAG BLOG, March 21, 2011, http://tag.microsoft.com/community/blog/t/the_growth_of_mobile_marketing_and _tagging.aspx (an infographic excerpted from a Microsoft-managed website commenting, "People are spending more time on their mobile phones than ever before . . . as marketers we have to understand these new types of consumers and how best to reach them.").

68.     For example, one such effort on Defendants' part includes the publishing of Twitter messages on the social networking website http://www.twitter.com asking consumers to send a text message with a keyword to a number owned by Defendants or Defendants' agents.  One such example is shown below in Figure 8:

Figure 8: Cellular Phone Number Solicitation Twitter Message.

69.    In addition to the keyword, "GAMER," Defendants engaged in numerous similar marketing campaigns, each time asking consumers to text various keywords to "29502" – Microsoft's SMS short code.  As a second example, Figure 2, below, shows a similar cellular phone number solicitation twitter message, requesting consumers to send a text message with the keyword, "SOCIAL" to 29502.



Figure 9: Sample Cellular Phone Number Solicitation Twitter Message, https://twitter.com/MicrosoftStore/status/573243653600243713.

### B. Defendants' Deceptive Facebook Disclosures

70.     The Microsoft Store Facebook.com account has been "liked" by 1.3 million people.[29]

71.     Defendants requested on the Facebook.com accounts of Microsoft Store that potential customers text Defendants to enter sweepstakes and be eligible for discount promotions.  For example, Defendants have requested users text "29502" with a message containing the phrase "HALO."  An example of Defendants' posting is below, Figure 10.

---

[29] *See* https://www.facebook.com/MicrosoftStore



Figure 10: *Microsoft Store HALO Solicitation*, FACEBOOK WEBSITE MICROSOFT STORE ACCOUNT, June 14, 2015, https://www.facebook.com/MicrosoftStore/posts/10153347428817480.

72.    Users who texted "HALO" to win a chance for the limited edition are automatically enrolled in Microsoft's automated text messaging advertisement program.  Further, the link provided in the Microsoft Facebook.com post regarding Halo fails to provide any information relating to legal restrictions.

73.    Clicking on the "HALO" posting on Facebook.com merely provides a user with a larger image of the deceptive promotion.

OLAVI DUNNE LLP

1

2

3

4

5

6

7

8

9



10

Figure 11: *Microsoft Store HALO Solicitation*, FACEBOOK WEBSITE MICROSOFT STORE ACCOUNT, June 14, 2015.
https://www.facebook.com/MicrosoftStore/posts/10153347428817480 (showing what appears on a user's screen by clicking on an image).

11

12          74.     The vast majority of the comments relating to the "HALO"

13   Facebook posting occurred in the 48 hour period after the posting was made to

14   Facebook.com (June 14, 2015).

15

16

17

18   

19

20

21

22

23

24

25   Figure 12: *Screen Shots of the Comments on The Halo Promotion*, FACEBOOK

26   WEBSITE MICROSOFT STORE ACCOUNT, June 14, 2015,
https://www.facebook.com/MicrosoftStore/posts/10153243843897480.

27

28

OLAVI DUNNE LLP

---

75.     Another deceptive and illegal posting on Microsoft's Facebook page, authored by Defendants, requests users provide their mobile phone number and text the phrase "SURPRISE" to "29502."  The complete lack of disclosure that accompanies this bait-and-switch advertisement is shown in this image, Figure 12.



Figure 13: *Microsoft Store SURPRISE Solicitatio*n, FACEBOOK WEBSITE MICROSOFT STORE ACCOUNT, May 6, 2015, ttps://www.facebook.com/MicrosoftStore/posts/10153243843897480.

76.     When one clicks on the image for Defendants' "SURPRISE" promotion, the user is taken to a photo for the promotion.  There is no disclosure that a user will be enrolled into the Microsoft Store's automatic marketing text message system.  Nor is there any disclosure that the public is not required to provide its phone number to Defendants as a condition for entry.  The below image illustrates that even when a user clicks on the promotional image, there is no disclosure that sending the text "SURPRISE" enrolls one in Defendants' automatic marketing text messaging program.

OLAVI DUNNE LLP



Figure 14: *Microsoft Store SURPRISE Solicitatio*n, FACEBOOK WEBSITE MICROSOFT STORE ACCOUNT, May 6, 2015, https://www.facebook.com/MicrosoftStore/photos/a.160861237479.117183.15091 5932479/10153243843897480/.

77.     Were an individual to receive the promotion via Facebook.com's messenger service, the unlawful solicitation of a user lacks the required disclosures to effect explicit written consent as shown below in Figures 13 and 14.

 

Figs. 13 & 14 (The image in Figure 13 on the left is the authoring of the message. The text promotion as received by a user.).

78.     Nearly every comment relating to the "SURPRISE" promotion was

OLAVI DUNNE LLP

1   posted on May 6th or May 7th.  *See* Figure 15, screenshots





Figure 15: *Microsoft Store SURPRISE Solicitation* Comments, FACEBOOK WEBSITE MICROSOFT STORE ACCOUNT, June 16, 2015.

79.     Defendants solicited mobile phone numbers using postings about Microsoft's gaming device, "XBOX."  The screen shots below in Figure 16 show the deficient disclosures Defendants employed to harvest phone numbers from prospective customers.

Olavi Dunne LLP





Figure 16: *Microsoft Store GAMER Solicitation*, FACEBOOK WEBSITE MICROSOFT STORE ACCOUNT, September 14, 2014. https://www.facebook.com/MicrosoftStore/photos/a.160861237479.117183.15091 5932479/10152676817642480/

## C. YouTube Disclosures

80.    Defendants also solicit the publics' phone numbers through

OLAVI DUNNE LLP

postings on YouTube.  For example, a December 5, 2014, posting on YouTube requests individuals to text HAPPY to 29502.  Microsoft fails to disclose that Defendants will automatically enroll the mobile device associated with the text message in Defendants' marketing program and bombard their mobile device with unconsented to text messages.

81.     Microsoft's posting on its YouTube Channel has been viewed over 1.7 million times.  Microsoft's posting fails to obtain express written consent to sign potential customers up for Microsoft's automated text messaging program. *See* Figure 17



FIGURE 17: MICROSOFT YOUTUBE CHANNEL, *Chloe and Halle Surprise Caroling at [sic] Microsoft Store*, December 5, 2014, https://www.youtube.com/watch?v=M_4nQ5BTn1w&feature=youtu.be.

### D. Having Obtained A Cell Phone Number, Defendants Automatically Enroll That Customer for a Barrage of Commercial Texts

82.     On information and belief, at the time Defendants published the cellular phone number solicitation twitter messages requesting consumers to send a text message to 29502, Defendants knew how to obtain consumers' express written consent by sending a single, informational text requesting consumers to opt in to receive marketing SMS messages.

83.     However, Microsoft disregarded the need for consumers' express written consent and instructed HelloWorld to construct an SMS message

OLAVI DUNNE LLP

marketing campaign that sends multiple marketing SMS messages without the express written consent of consumers.

84.    Defendants do not make clear to a reasonable consumer that, by sending a text message to SMS short code 29502, he or she is agreeing to receive several autodialed marketing SMS messages for weeks and months at the cellular phone number from which the consumer sent the text message to Defendant.

85.    Defendants require, either directly or indirectly, that consumers send a text message to SMS short code 29502 as a condition of purchasing a product or service.  For example, the cellular phone number solicitation twitter message shown above in Figures 16 & 13 suggests that consumers will receive a "special offer" by sending a text message to Defendants' SMS short code.

86.    A reasonable consumer would understand from Defendants' twitter messages that certain products would be sold only to those consumers who had texted "GAMER" to Defendants' SMS short code.

87.    For instance, on or about May 21, 2015, Plaintiffs received from Defendants' SMS short code, 29502, the "special offer" shown below in Figure 18.  In this "special offer," Defendants offered "The Masterchief Collection" with an "exclusive all-white Xbox One Console."  *See* Figure 18.



Figure 18: *Microsoft Store Advertisement*, MICROSOFT COMMERCIAL TEXT, May 21, 2015.

88.    Prior to sending a text message to Defendants' SMS short code, a reasonable consumer would have understood that "special offers" would include the opportunity to purchase "exclusive" product offerings from Microsoft.

89.    Upon receiving the SMS marketing message shown above in Figures 10, 13, 16, 17, a reasonable consumer would believe that he or she was being offered the opportunity to purchase "The Masterchief Collection and exclusive all-white Xbox One Console" solely because he or she had previously sent a text message to Defendants' SMS short code.

90.    Consumers can purchase Microsoft products at discounted prices only available to those consenting to receive marketing SMS text messages from Defendants.  Conditioning the eligibility for a promotion on providing one's cellular phone number to Defendants is unlawful under the TCPA and UCL § 17200.

91.    In addition to not receiving prior express written consent from

Olavi Dunne LLP

consumers before sending marketing SMS messages, Defendants do not allow consumers to designate a telephone number at which to receive any marketing SMS messages. For example, the cellular phone number solicitation twitter message shown above in Figures 10, 13, 16, 17 contains no disclosure stating that Defendants' marketing SMS messages must be sent to the consumer's cellular telephone number he or she used to send the initial text message to Defendants' SMS short code. The solicitation twitter message shown in Figure 16 does not contain any disclosure requesting users to send a text message to Defendants' SMS short code using the phone number on which the consumer would like to receive SMS marketing messages.

92.     After sending a text message with the word "GAMER" to 29502 in response to the cellular phone number solicitation twitter message shown above in Figure 16, Plaintiffs were never provided the opportunity to designate a phone number as the number at which Defendants should send marketing SMS messages.

93.     Over the course of an extended period, Defendants directed the mass transmission of wireless spam SMS message calls to cell phones nationwide of what it hoped were potential customers of Microsoft products and/or services. On April 29, 2015, one or more Plaintiffs sent an SMS text message with the word "GAMER" to 29502 – Defendants' SMS short code.

94.     One or more of the Plaintiffs was unaware the April 29, 2015, SMS text message he sent to 29502 would result in Defendants sending repeated marketing SMS messages to Plaintiff's cellular phone number.

95.     Within seconds of sending the SMS text message with the word "GAMER," to SMS short code 29502, Plaintiff(s) received a marketing SMS message, offering Plaintiff(s) a discount of 5% off his/her next in-store purchase at a Microsoft store.

OLAVI DUNNE LLP

96.     Seconds after receiving the marketing SMS message from Defendants offering 5% off in-store purchases, Defendants sent a second SMS message to Plaintiff stating, "MICROSOFT STORE: You're signed up to receive alerts and deals.  Message and data rates may apply.  Up to 10 messages / month. Text STOP to cancel.  HELP for help."

97.     Upon viewing the initial SMS message offering a 5% discount off in-store purchases, Plaintiff(s) viewed messages from "MICROSOFT STORE" and originating from 29502 as spam (*i.e.*, unsolicited and undesired electronic messages) marketing messages.

98.     On May 20, 2015, Plaintiff(s) received the marketing SMS message from Defendant Microsoft shown below in Figure 19.



Figure 19: *Microsoft Store Subsequent Commercial Advertisement*, MICROSOFT COMMERCIAL TEXT, May 20, 2015.

OLAVI DUNNE LLP

99.     On July 8, 2015, Plaintiffs received an additional commercial text message promoting the release of Microsoft's "Forza Motorsport 6 Bundle." Not only was this unlawful text unconsented to, but Defendants failed to provide any notice to the recipients relating to how to prevent or unsubscribe from receiving future commercial text messages.



Figure 20: *Microsoft Store Subsequent Commercial Advertisement*, MICROSOFT COMMERCIAL TEXT, July 8, 2015.

100.    At no time did Plaintiffs provide their prior express written consent to the receipt of marketing SMS messages from Defendants Microsoft and HelloWorld.

101.    At no time did Defendants provide any disclosure, or otherwise make clear, to Plaintiffs that texting Defendants' SMS short code was not required as a condition of purchasing any good or service.

102.    At no time did Defendants provide Plaintiffs with the opportunity to designate a telephone number as the number at which SMS marketing messages should be received.

103.    Defendants' opt-out, "gotacha" strategy is deficient under industry

OLAVI DUNNE LLP

standards, consumer expectations, and the disclosures that are contained in the opt-out message are far from what is required under the TCPA. Specifically, the disclosures fail to inform the users of various aspects of the TCPA's required disclosures, and thus are insufficient to obtain express written consent.

104.    For example, the cellular phone number solicitations on Facebook and Twitter published by Defendants provide no explanation of what Defendants intend to do with the cellular phone numbers provided by consumers when they send a text message to 29502 – Defendants' SMS short code. These twitter messages do not provide a reasonable consumer with a clear and conspicuous disclosure that Defendants will send multiple autodialed marketing SMS messages to the consumer's cellular phone number over the course of weeks and months.

105.    In response to Defendants' cellular phone number solicitation twitter messages, a reasonable consumer is likely to expect one of various responses from Defendants, including a phone call from a live sales agent, a single, informational text message that invites the consumer to visit a website that provides the consumer with the information and offers advertised on Defendants' twitter message, or a single, informational text message that provides additional information regarding Defendants' text message marketing efforts and invites consumers to opt-in to receiving additional text messages after the consumer has had the opportunity to review a full disclosure of how Defendants' SMS message marketing program will affect the consumer and allow the consumer to provide his or her prior express written consent by sending a confirmatory text message, thus expressly consenting to receive Defendants' SMS message marketing messages.

**E. Microsoft and its Marketing Agency HelloWorld's Scheme to Enroll Potential Customers in Automated Text Programs**

106.    Defendants undertook to design a program that would maximize

OLAVI DUNNE LLP

their benefit.

The mobile phone opens an interactive channel to engage nearly everyone in the country.  Today, 91 percent of the U.S. population carries a mobile phone with one in four subscribers regularly accessing the mobile web.

*Microsoft Advertising White Paper*, THE AUTOMOTIVE INDUSTRY'S GUIDE TO MOBILE ADVERTISING 4 (2011).

Hyper-fragmentation of media and high-cost, low response rates for direct mail and other traditional channels make mobile advertising a very attractive option for CPG brands. Mobile is personal, immediate and uncluttered.

*Microsoft Advertising White Paper*, THE CONSUMER PACKAGED GOODS INDUSTRY'S GUIDE TO MOBILE ADVERTISING 7 (2011).

***Nomophobia***: the fear of being out of mobile phone contact. Some reports say that 53% of men and 48% of women suffer from this socially debilitating condition. This information along with the fact that texting is still the activity most engaged with on a mobile device means ***SMS marketing is a vital component*** of a well executed marketing plan.

*SMS Is the Perfect Conduit*, HELLOWORLD WEBINAR, January 22, 2014http://www.helloworld.com/insights/webinars/sms-is-the-perfect-conduit/ (emphasis added).[30]

***Consumers like having a chance at their "15 minutes of fame"*** making the contest viral as they share their entry among their networks. Brands benefit from consumer-supplied content which is considered highly credible to other consumers.

Melissa Summers, *Engagement Tactics That Work for Brands*, HELLOWORLD BLOG, May 20, 2015, http://www.helloworld.com/insights/blog/promotions/2015/05/20/engagement-tactics-that-work-for-brands/ (emphasis added).

Customers who get direct notifications of a deal are far more likely to patronize your business overall.  SMS marketing can be your biggest driver in the weeks and months before Thanksgiving.

*5 Tips to Grow Your SMS Database by Black Friday*, HELLOWORLD EBOOK PRESENTATION, September 5, 2014, http://www.slideshare.net/HelloWorld_Inc/helloworld-e-book5tipsgrowingsmsdatabaseslideshare.

---

[30] Microsoft's unlawful SMS solicitation program was co-managed by HelloWorld, Inc. The referenced Webinar on the advantages of sending SMS messages to potential customers was presented by Eric Lazar, HelloWorld's VP of Mobile Business Development.

OLAVI DUNNE LLP

OLAVI DUNNE LLP

One of the key findings is that SMS produces engagement rates six to eight times higher than retailers normally achieve via email marketing when used for redemption, data collection and brand awareness.

Chantal Tode, *SMS Has Eight Times The Response Rate Of Email: Study*, MOBILE COMMERCE DAILY, May 25, 2012, http://www.mobilecommercedaily.com/sms-has-eight-times-the-response-rate-of-email-study (study based on review of 1,180 marketing campaigns conducted by retailers).

### F. Microsoft's Failure to Follow its Own Privacy Policies and TCPA Guidelines

107.   Microsoft classifies phone numbers as Personally Identifiable Information ("PII"). In a 2015 presentation, Microsoft outlined the specific ways that PII should be handled.  Here, the sending of the initial text message provides Microsoft with the person's phone number, Figure 21.



FIGURE 21: PRIVACY IN SOFTWARE DEVELOPMENT at 18 (2008).

108.   Where, as here, the PII is collected for a specific purpose, Microsoft's own guidelines specify that clear and explicit consent must be obtained before PII is used for a secondary purpose (automatically opting in a user for text message marketing advertisements).



FIGURE 22: PRIVACY IN SOFTWARE DEVELOPMENT at 34 (2008).

109.    Microsoft itself demands "express written consent" in numerous contracts, licensing agreements, and terms of service.  For example,

- Microsoft App Developer Agreement, Windows Store Version 7.0 § 12.c, April 29, 2015, https://msdn.microsoft.com/en-us/library/windows/apps/hh694058.aspx ("You may not assign this Agreement or any rights or duties under it without the express written consent of Microsoft.").

- Microsoft Office Live Meeting Terms of Service § 29, February 2008 ("No party may assign this Agreement, or any rights or obligations hereunder, whether by contract, operation of law, or otherwise without the express written consent of the other party to the Agreement.").

- Microsoft Services Agreement § 8.2, July 31, 2014, http://windows.microsoft.com/en-us/windows/microsoft-services-agreement ("You may not use the embeddable video player on any website whose purpose is primarily for the display of advertising or collection of subscription revenues or is in direct competition with Bing or MSN unless you first get our express, written consent.").

- Microsoft Azure Agreement § 6.b, January 2014, http://azure.microsoft.com/de-de/support/legal/subscription-agreement-nov-2014/ ("Our obligations in subsection 6(a) will not apply to a claim or award based on . . . your use of a Microsoft trademark without our express written consent.").

## VI.    CLASS ALLEGATIONS

110.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), Rule 23(b)(2), and Rule 23(b)(3) on behalf of themselves and a putative class (the "Class") of similarly situated individuals, defined as follows:

> All persons in the United States and its Territories who have not provided prior express written consent for Defendants to send marketing SMS messages through a Microsoft internet web form, but who received one or more unauthorized marketing SMS messages on behalf of Defendant Microsoft after sending a SMS text message of one or more of the following keywords: "GAMER," "HAPPY," "HALO," "SURPRISE," "SOCIAL," "PLAY," "WALDEN," "EVENTS," or "MSHS" to SMS short code 29502 on or after October 16, 2013.

111.    Excluded from the Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

112.    The exact number of Class members is large and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable.

113.    The Class is likely to consist of thousands of individuals as Defendants solicited mobile phone numbers through webpages that were viewed by millions of individuals.  The channels that Defendants used to solicit mobile phone numbers include: the Microsoft Store Twitter page, which has 815,000 "Followers;"[31] the Microsoft Store YouTube Channel, where the page containing the mobile phone number solicitation was viewed over 1.7 million times; and the Microsoft Store Facebook.com page, which has been "liked" by 1.4 million people.

---

[31] https://twitter.com/MicrosoftStore

OLAVI DUNNE LLP

114.    Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

115.    Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and would have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

116.    Defendants acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class in transmitting the wireless spam messages at issue, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class.

117.    Plaintiffs and members of the Class were harmed by the acts of Defendants in at least the following ways: Defendants illegally contacted Plaintiffs and the Class members via their cellular telephones, thus invading the privacy of the Plaintiffs and the Class members.  Plaintiffs and the Class members were damaged by Defendants' conduct.

118.    The factual and legal basis of Defendants' liability to Plaintiffs and to the other members of the Class are the same, resulting in injury to the Plaintiffs and to all other members of the Class as a result of the transmission of the wireless spam text messages alleged herein.  Plaintiffs and the other Class members have all suffered harm and damages as a result of Defendants' unlawful and wrongful

conduct and transmission of the wireless spam text messages.

119.    Plaintiffs reserve the right to expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

120.    There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include, but are not limited to, the following:

a) Whether the Defendants' text messages were sent for an emergency purpose;

b) Whether the Defendants obtained valid express written consent from the automated text message recipients;

c) Whether Defendants adhered to requests by Class members to stop sending text messages;

d) Whether the Defendants keep records of text message recipients who revoked consent to receive text messages;

e) Whether Plaintiffs and members of the Class are entitled to damages, costs, or attorney's fees from Defendants;

f) Whether Defendants' conduct caused Plaintiffs and members of the Class inconvenience or annoyance;

g) Whether Plaintiffs and members of the Class are entitled to compensatory damages;

h) Whether Plaintiffs and members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct;

i) Whether Plaintiffs and members of the Class are entitled to a permanent injunction enjoining Defendants from continuing to engage in its unlawful conduct.

121.    As a person who received numerous marketing SMS messages from Defendants, without prior express written consent, Plaintiffs are asserting claims that are typical of the Class.  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that Plaintiffs have no interests antagonistic to any member of the Class.

122.    Plaintiffs and the members of the Class all suffered irreparable harm as a result of Defendants' unlawful and wrongful conduct.  Absent a class

OLAVI DUNNE LLP

action, the Class will continue to face the potential for irreparable harm.  In addition, these violations of law will be allowed to proceed without remedy and Defendants will likely continue such illegal conduct.  Because of the size of the individual Class member's claims, few, if any, Class members would afford to seek legal redress for the wrongs complained of herein.

123.   A class action is a superior method for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Defendants to comply with Federal law.  The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the maximum statutory damages in an individual action for violation of privacy are minimal.  Management of these claims is likely to present significantly fewer difficulties than those presented in litigating a multitude of class claims concurrently.

124.   Defendants acted on grounds generally applicable to the Class, making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

125.   The class is ascertainable as Microsoft maintains records of customers that have provided express written consent.

*Track, measure and analyze*. Mobile advertising is extremely measurable. Be sure to continuously track, measure and analyze the results of a program and make adjustments as necessary throughout the life of your mobile advertising campaign.

*Microsoft Advertising White Paper*, The Consumer Packaged Goods Industry's Guide to Mobile Advertising 11 (2011).

## FIRST CAUSE OF ACTION
### Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*:
### (On Behalf of All Plaintiffs and Class Members)

126.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth.

127.   Defendants made unsolicited commercial text calls, including the messages transcribed and depicted above, to the cellular telephone numbers of the

OLAVI DUNNE LLP

Class.  Each such text message call was made using equipment that had the capacity to store or produce telephone numbers using a random or sequential number generator, and to dial such numbers.  By using such equipment, Defendants were able to effectively send marketing SMS messages simultaneously to lists of thousands of cellular telephone numbers without human intervention.

128.    These text calls were made *en masse* through the use of a short code and without the prior express written consent of Plaintiffs and the other members of the Class.

129.    Defendants used an automatic telephone dialing system ("ATDS"). Moreover, the uniform content and instantaneous timing of the text messages sent by the Defendants indicates that they were sent without human intervention, which the FCC has identified as the "basic function" of an ATDS.

130.    Defendants have, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendants' illegal conduct, Plaintiffs and the members of the Class suffered actual damages by, *inter alia*, having to pay their respective wireless carriers for the text messages where applicable and, under section 227(b)(3)(B), are each entitled to, *inter alia,* a minimum of $500.00 in damages for each violation of such act.

131.    As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and the members of the Class are entitled to treble damages, as provided by statute, up to $1,500.00, for each and every violation, pursuant to 47 U.S.C. §§ 227(b)(3)(B) and 227(b)(3)(C).

132.    Plaintiffs and the members of the Class are also entitled to and seek injunctive relief prohibiting such conduct on the part of Defendants in the future.

## SECOND CAUSE OF ACTION
### (Violation of Cal. Bus. & Prof. Code § 17200)

133.    Plaintiffs incorporate each of the foregoing allegations as if fully set

OLAVI DUNNE LLP

forth.

134.    Whether Defendants' conduct described violated California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et. seq.*);

135.    As described, Defendants' nonconsensual violations of the law and misleading statements are unlawful under § 17200.

136.    These violations satisfy the "unlawful" prong of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code. § 17200, *et seq.*

137.    Defendants violated the "fraudulent" prong of the UCL by intentionally and knowingly misrepresenting that Plaintiffs and potential customers have full control to prevent the sending of a barrage of SMS messages to their mobile phones.  Defendants intentionally misrepresented to the public that they would not send repeated commercial text messages.  Plaintiffs justifiably relied upon those misrepresentations when deciding to provide Defendants with their mobile phone numbers.  Plaintiffs suffered damages of deprivation of money earned by the misrepresentations, an amount to be proven at trial.

138.    Defendants violated the "unfair" prong of the UCL by leading the public to believe that commercial text messages would not be sent to them without their permission.

139.    Defendants violated the "unfair" prong of the UCL by intentionally profiting from the nonconsensual sending of repeated text messages.

140.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order of this Court permanently enjoining Defendants from continuing to engage in the unlawful, unfair, and fraudulent conduct described herein.  Plaintiffs seek an order requiring Defendants to (1) immediately cease the unlawful practices stated in this Complaint, and (2) award Plaintiffs and the Class reasonable costs and attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5.

141.    Plaintiffs each lost money to which they were entitled in the form

OLAVI DUNNE LLP

of compensation for the sending of non-consented to text messages to their mobile devices, and in which they had a stake, by virtue of Defendants' conduct. Plaintiffs are entitled to restitution of these sums.

OLAVI DUNNE LLP

**PRAYER FOR RELIEF**

142.    WHEREFORE, Plaintiffs, on behalf of themselves and the Class, requests the following relief against Defendants:

- Certify this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as class representatives and Olavi Dunne LLP as class counsel;
- Enjoin Defendants from violating the TCPA and UCL in the future by placing auto-dialed or pre-recorded calls and/or text messages to cellular telephone numbers;
- Enjoin HelloWorld from sending commercial text messages advertising products and services to cellular telephone numbers of individuals residing in the United States;
- Enjoin Microsoft from sending commercial text messages advertising products and services to cellular telephone numbers of individuals residing in the United States;
- Award actual damages to Plaintiffs where they are greater than statutory damages pursuant to 47 U.S.C. § 227;
- Award statutory damages to the class pursuant to 47 U.S.C. § 227;
- Award actual damages and any other such relief as available under the Cal. Bus. & Prof. Code § 17200;
- Award reasonable attorneys' fees and costs to compensate Plaintiffs' counsel for the time and litigation expenses incurred on behalf of Mr. Pietzak and Ms. Hudson and the Class.
- Issue other relief as the Court deems equitable and just.

OLAVI DUNNE LLP

Dated: July 21, 2015       Respectfully submitted,

/s/  Daniel P. Hipskind_____

Daniel P. Hipskind (CA SB No. 266763)
Dorian S. Berger (CA SB No. 264424)
OLAVI DUNNE LLP
1880 Century Park East, Ste. 815
Los Angeles, CA 90067
Telephone: 213-516-7900
Facsimile: 213-516-7910
E-mail: dhipskind@olavidunne.com
E-mail: dberger@olavidunne.com

Matt Olavi (CA SB No. 265945)
Brian J. Dunne (CA SB No. 275689)
OLAVI DUNNE LLP
816 Congress Ave., Ste. 1620
Austin, Texas 78701
Telephone: 512-717-4485
Facsimile: 512-717-4495
E-mail: molavi@olavidunne.com
E-mail: bdunne@olavidunne.com

*Attorneys for Plaintiffs and the Proposed Class*

OLAVI DUNNE LLP